IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MICHELE GRACIANO,               )
                                )
          Plaintiff.            )
                                )
     v.                         )
                                )   Civil Case No. 10-1529
MICHAEL J. ASTRUE,              )
Commissioner of Social Security,)
                                )
          Defendant.            )

**MEMORANDUM OPINION**

CONTI, District Judge.

I. **INTRODUCTION**

Michele Graciano ("Plaintiff" or "Graciano") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-83f (the "Act"). This matter comes before the court on cross-motions for summary judgment. (ECF Nos. 6, 8). The record was developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Judgment is GRANTED.

## II. Procedural History

Graciano filed for DIB and SSI with the Social Security Administration on August 5, 2008, claiming an inability to work due to disability as of March 18, 2008. (R. at 90-100).[1] She was initially denied benefits on October 6, 2008. (R. at 68-77). A hearing was held on March 31, 2010, at which Plaintiff, who was represented by counsel, testified. (R. at 45-64). A vocational expert also testified at the hearing. (R. at 61-63). The Administrative Law Judge ("ALJ") issued his decision denying benefits to Plaintiff on April 6, 2010. (R. at 6- 21). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council. The request was denied on September 14, 2010, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1-3).

Plaintiff filed her complaint in this court on November 17, 2010. (ECF No. 3). Defendant filed an answer on January 21, 2011. (ECF No. 4). Cross-motions for summary judgment followed. (ECF Nos. 6, 8).

## III. Statement of the Case[2]

### A. General Background

Graciano was born on September 4, 1970, and was thirty-nine years old at the time of her administrative hearing. (R. at 90-100). She lived with her fiancé and had a sixteen-year-old daughter and a twenty-year-old son. (R. at 59, 107). Plaintiff graduated from high school, and was enrolled in college level courses in pursuit of an associate's degree. (R. at 52- 53). The courses were internet-based. (R. at 52–53).

---

[1] Citations to ECF. Nos. 5 – 5-8, the Record, hereinafter, "R. at __."

[2] Discussion will be limited to the facts as they relate only to Plaintiff's physical impairments. In her brief, Plaintiff did not address the ALJ's conclusions with respect to her alleged psychological impairment; therefore, the court will not discuss that portion of the ALJ's decision. (ECF No. 7 at 5-9).

Plaintiff's past relevant employment immediately prior to her disability onset date included employment as a night monitor/counselor at a juvenile detention center and as a self-employed babysitter. (R. at 48, 119–20). She had last worked a full-time job in 2008. (R. at 48). She attempted part-time work assisting mentally handicapped adults briefly in 2009. (R. at 48). Plaintiff claimed that she ultimately was unable to hold any job due to pain and limitations stemming from knee and back injuries sustained while working as a night monitor/counselor in 2006. (R. at 118). Plaintiff claimed that she had difficulties walking, sitting, standing, and lifting. (R. at 112, 115). Plaintiff stated that she required the use of a cane and brace/splint. (R. at 113, 116). Her pain was intermittent throughout the day. (R. at 107, 109-10, 112, 114-16). She also considered diagnosed depression as an impairment precluding her ability to work. (R. at 112, 114).

In a self-report of functional capacity, Plaintiff stated that her daily activities included making sure that her daughter was ready for school, making breakfast, cooking meals, caring for her dog, shopping for groceries, clothing, and other necessities, and cleaning the house. (R. at 106-16). Plaintiff also enjoyed watching television. (R. at 107, 111). Plaintiff claimed that pain in her knee and back limited her at times. (R. at 107, 109-10, 112-16). If she cooked, it involved meals that were fast and easy to prepare. (R. at 107-09, 114). Her daughter often helped her with daily chores. (R. at 108-09). Plaintiff maintained a driver's license and was capable of driving on her own. (R. at 110). Plaintiff paid her bills, and could handle savings and checking accounts. (R. at 110-11). Plaintiff's hobbies included singing and reading. (R. at 111). Plaintiff regularly went to church. (Id.).

Plaintiff indicated that she had no difficulties getting along with family, friends, neighbors, or other people in general. (R. at 112). Her ability to maintain attention was intact, she could finish activities she started, she followed instructions well, and her ability to get along

3

with authority figures was good. (R. at 112-13). Plaintiff could somewhat handle stress, but handled changes in routine fairly well. (R. at 113).

**B. Treatment History**

On January 12, 2007, Plaintiff appeared at the office of Ann-Richie Rodriguez, M.D., complaining of left knee pain. (R. at 191-92). Plaintiff initially presented to Dr. Rodriguez on December 11, 2006. (R. at 191). Plaintiff was diagnosed with a left meniscal tear. (R. at 191-92). Arthroscopy was suggested. (R. at 191). At the January 12, 2007 visit, Plaintiff's knee had no deformities, but showed minimal effusions, medial joint line tenderness, and limited range of motion. (Id.) A valgus stress test was positive, but Lachman's testing and a varus stress test produced negative results. (R. at 191). No crepitus was noted. (Id.).

Following a lack of improvement in knee pain with conservative treatment, Plaintiff was recommended for arthroscopic partial meniscectomy for a lateral meniscus tear and degenerative joint disease. (R. at 216). A surgeon, Michael Tranovich, M.D., performed an arthroscopic chondroplasty and partial meniscectomy on Plaintiff's left knee on January 22, 2007. (R. at 217). Plaintiff's knee was observed to have significant arthritis and a tear of the lateral meniscus. (Id.). Plaintiff tolerated the procedure well. (Id.).

Plaintiff was seen by Dr. Rodriguez and David Garzarelli, M.D. on February 15, 2007 following her arthroscopy. (R. at 187-90). Three weeks after the surgery, Plaintiff was complaining of mild pain and was walking with crutches. (R. at 189). It was noted that Plaintiff was to begin physical therapy the following week. (Id.). Plaintiff's left knee was restricted in range of motion due to pain, but was stable, showed no crepitus, and showed no deformity. (Id.).

Following her surgical procedure, Plaintiff regularly followed up with Dr. Tranovich. (R. at 207-15). Plaintiff was at times noted to experience symptoms of synovitis, mild swelling, mild tenderness, minimal effusion, subjective discomfort and some weakness, often exacerbated

by activity, but with mild improvement over time. (Id.). She was to engage in physical therapy and was provided prescription medication and injections for pain. (Id.). Despite slow improvement in pain and limitations associated with her left knee, by June 21, 2007, Dr. Tranovich considered Plaintiff capable of light duty or sedentary work. (R. at 207-08). Due to reported increases in pain, by August 16, 2007, Dr. Tranovich indicated that Plaintiff may not be able to continue working. (R. at 206).

Plaintiff completed a full course of physical therapy by October 2007. (R. at 201). She still complained to Dr. Tranovich about pain in her left knee, which worsened with activity. (Id.). Dr. Tranovich observed minimal synovitis, distal tenderness in the quadriceps of the knee, and mild instability. (Id.). Plaintiff was to use a TENS unit for pain relief. (Id.). Various injections into the left knee beginning in July 2007 and ending in September 2007 were allegedly ineffective in alleviating Plaintiff's pain. (R. at 201-07).

Plaintiff's physical therapy discharge summary indicated that Plaintiff attended eighty-one therapy sessions. (R. at 222). Plaintiff was noted as capable of riding a bicycle for ten minutes and performing a left knee extension of forty pounds. (Id.). Plaintiff could perform a leg press up to eighty pounds. (Id.). Plaintiff rated her knee pain as four on a pain scale of ten, although the therapist had hoped to achieve greater pain relief. (Id.). Plaintiff did have nearly full knee strength in both extension and flexion. (Id.). Plaintiff's physical therapist felt that Plaintiff plateaued in her recovery and would not likely see continued improvement from physical therapy. (Id.). Plaintiff was advised to continue home exercise and consider pain management therapy. (Id.).

Plaintiff followed up with Dr. Tranovich again on November 16, 2007 due to left knee pain. (R. at 200). Her discomfort was exacerbated by movement. (Id.). Physical examination found minimal swelling, diffuse tenderness, and an extraordinary pain reflex. (Id.). Plaintiff

was determined to be unfit to work, and she was to consult with a pain management specialist. (Id.).

Plaintiff visited Dr. Tranovich on December 26, 2007, complaining of left knee and lower back pain. (R. at 199). She stated that the back pain radiated into her thighs. (Id.). Upon examination, Dr. Tranovich found Plaintiff's knee exhibited minimal swelling, minimal tenderness, no evidence of significant synovitis, and a full range of motion. (Id.). Plaintiff completed heel-toe walking exercises with normal results, had a negative squat test, had negative straight leg raising, had intact reflexes, showed full range of motion in the hips, and had only mild restriction of flexion and extension. (Id.). There was moderate paravertebral spasm. (Id.). MRI results showed no significant stenosis or herniation. (R. at 199, 221). EMG and nerve conduction studies of Plaintiff's left leg were normal. (R. at 199, 219-20). Plaintiff was to continue physical therapy for her knee and conservative pain management therapy for her back. (R. at 199).

Plaintiff returned to Dr. Tranovich on February 6, 2008. (R. at 198). Dr. Tranovich stated that Plaintiff reported feeling better, overall, but was still significantly disabled by knee and thigh pain. (Id.). Plaintiff's left knee was found to have a full range of motion, there was no point tenderness, and there was no evidence of effusion; but, there were hyperesthesias in the knee and thigh area. (Id.). He noted that Plaintiff's back had been in pain and that an epidural injection was administered, which Plaintiff believed was helpful. (Id.). Plaintiff was to engage in treatment to manage her pain. (Id.).

Plaintiff was evaluated by Edward Heres, M.D., of UPMC Pain Medicine on February 6, 2008. (R. at 168-71). Dr. Heres noted Plaintiff's history of left knee and back pain originating with a work-related accident in December 2006. (R. at 168). The pain emanating from Plaintiff's lower back allegedly traveled down her left leg as far as her left knee. (Id.). There

6

was no numbness or tingling, but the pain was constant and throbbing. (Id.). Walking and changes in the weather exacerbated the pain. (Id.). Plaintiff's left knee was occasionally swollen and made walking problematic. (R. at 169). Dr. Heres indicated that other treatment modalities such as a TENS unit and physical therapy failed. (R. at 168). Plaintiff was maintained on naproxen[3] for pain. (R. at 168).

Dr. Heres observed that Plaintiff had a steady gait, and walked without a cane, although Plaintiff claimed to have left it at her home. (R. at 169). She did have a brace on her knee. (Id.). Testing showed full muscle strength in both legs, normal range of motion, and intact sensation. (R. at 169). There was some swelling and tenderness in the left knee. (Id.). An MRI showed damage in the left knee joint. (Id.). Some tenderness around the sacroiliac joint in the pelvis was noted. (Id.). An injection for pain at the sacroiliac joint was administered by Dr. Heres during Plaintiff's visit. (R. at 170). Plaintiff was referred to an orthopedic surgeon for her continued knee pain. (Id.).

Plaintiff was evaluated by orthopedic surgeon Adolph Yates, M.D., on February 14, 2008. (R. at 175-76). Dr. Yates noted Plaintiff's history of left knee pain and back pain subsequent to a work-related injury. (R. at 175). Plaintiff's left knee arthroscopy was also noted. (Id.). Dr. Yates opined that Plaintiff's knee condition had not improved. (R. at 176). Dr. Yates observed that Plaintiff's left hip moved freely, and without referred pain to the left knee. (R. at 175). Straight leg raising was negative, strength was full, and there was no knee effusion. (Id.). There was, however, some crepitus and some tenderness of the knee. (R. at 176). Plaintiff exhibited full extension and flexion. (Id.). An MRI of Plaintiff's back was unremarkable. (Id.). An MRI of her knee showed low-grade patellofemoral chondromalacia, past anterolateral

---

[3] Naproxen "is a nonsteroidal anti-inflammatory drug (NSAID) with analgesic and antipytetic properties. *Physician's Desk Reference* 2632 (63 ed. 2009).

meniscal tear, and presence of a non-specific cyst. (Id.). More imaging studies were ordered. (Id.).

Upon returning to Dr. Yates on February 27, 2008, Plaintiff's back and knee symptoms were noted to be the same. (R. at 173-74). Following a review of Plaintiff's new MRI's, Dr. Yates felt that her condition was outside of his area of expertise, and he could offer her no help. (Id.). He observed some residual meniscus tears with subluxation and extrusion. (Id.). Bone scans showed no fractures and only some low-grade degenerative joint disease. (Id.). He was uncertain of the etiology of Plaintiff's back pain. (Id.).

Vonda Wright, M.D., saw Plaintiff on April 14, 2008. (R. at 194). She noted that Plaintiff was engaged in physical therapy and that Plaintiff continued to experience pain anteriorly over the patella and distal quad, and in her anterior lateral meniscus. (Id.). Dr. Wright opined that Plaintiff would not be able to return to her previous jobs with the described pain, but that she would be fully capable of engaging in sedentary work. (Id.). Dr. Wright saw Plaintiff again on June 6, 2008. (R. at 194). Plaintiff continued to complain of knee pain. (Id.). Plaintiff was to continue with physical therapy. (Id.). If the therapy did not provide relief, Dr. Wright indicated that she would prescribe medication for pain. (Id.).

Plaintiff had reinitiated physical therapy in March 2008 and continued through May 2008. (R. at 259-60). Plaintiff attended twenty therapy sessions, and was found to have attained her maximum therapeutic benefit. (R. at 259). Plaintiff rated her knee pain as six on a pain scale of ten. (Id.). Medial/lateral gapping tests and grind tests of the left knee were normal. (R. at 260). Her left knee strength was nearly normal; however, her pain showed little improvement. (R. at 259-60).

On August 8, 2008, Plaintiff was seen by Dr. Tranovich for follow up on her left knee surgery. (R. at 196). Dr. Tranovich noted Plaintiff's complaints of anterior knee tenderness.

8

(Id.). Upon examination, ill tracking of the patella was minimal, range of motion was full, instability was mild, there was neither locking nor giving way, and there were signs of only mild synovitis. (Id.). X-rays showed minimal medial narrowing, good tracking of the patella, and mild effusion. (Id.). Despite continued synovitis, Plaintiff was without significant mechanical problems. (Id.). Plaintiff was prescribed anti-inflammatories, and pain medication for occasional use. (Id.). Plaintiff was to work on strengthening her knees and reducing her weight. (Id.). In an accompanying Worker's Compensation Report, Dr. Tranovich indicated that Plaintiff was limited to lifting twenty pounds, and could do intermittent walking and standing for eight hours per day with breaks as needed. (R. at 197).

State agency evaluator Mary Diane Zelnak completed a physical residual functional capacity ("RFC") assessment on September 23, 2008. (R. at 239-45). Subsequent to a review of Plaintiff's medical record, Ms. Zelnak diagnosed Plaintiff with degenerative joint disease, mitral valve prolapse, and multinodular goiter. (R. at 244). Plaintiff's exertional limitations were indicated to include only occasional lifting of twenty pounds, frequent lifting of ten pounds, standing and walking approximately six hours of an eight-hour day, and sitting six hours. (R. at 240). Ms. Zelnak indicated that medical source statements in Plaintiff's file did not differ significantly from her conclusions. (R. at 243). Ms. Zelnak opined that Plaintiff's complaints of pain and limitation were not fully credible. (R. at 245). Plaintiff complained that she could only walk for five minutes before requiring a rest, and that she had pain daily. (R. at 244). Ms. Zelnak, however, noted that Plaintiff cared for her daughter, was capable of driving and shopping, could care for herself, and cooked. (Id.). Ms. Zelnak also cited Dr. Tranovich's August 8, 2008 assessment of Plaintiff's ability to work, and Dr. Wright's April 14, 2008 assessment, as indicating that Plaintiff was not as limited as claimed. (R. at 245).

9

On March 12, 2009, Dr. Tranovich administered an injection for Plaintiff's knee pain. (R. at 264-65). At the time, Plaintiff's knee had mild valgus orientation, and minimal tenderness along the joint line, but had marked tenderness over the patellofemoral joint and some degree of luxation. (R. at 264). There was minimal instability, but Plaintiff did exhibit some swelling and used a cane for ambulation. (Id.).

Plaintiff returned to Dr. Tranovich on April 3, 2009. (R. at 262). Plaintiff complained of continued pain and tenderness in the left knee, and had been increasingly symptomatic. (Id.). Diagnostic imaging had recently revealed significant chondrosis of the patellofemoral compartment and lateral compartment. (Id.). She, however, did not have acute meniscal or ligamentous damage. (Id.). Dr. Tranovich suggested losing weight and strengthening Plaintiff's quadriceps. (Id.). He also suggested arthroscopic debridement of the areas of Plaintiff's knee where chondrosis was found. (Id.). That same day, Dr. Tranovich completed a Worker's Compensation Report indicating that Plaintiff was unable to return to work. (R. at 263).

Records indicated that Plaintiff visited her primary care physician on September 15, 2009 regarding left knee pain and back pain. (R. at 312-15). She complained of difficulty moving for the previous three weeks, that her lower back pain was sharp, and her knee pain was constant. (R. at 312). Her prescription pain medication ran out in April 2009. (Id.). She had not seen Dr. Tranovich since March 2009, and wanted a second opinion about further knee surgery. (R. at 312-13). Upon examination, Plaintiff's physician stated that her left knee was slightly larger than the right, with medial joint line tenderness and tenderness above the kneecap. (R. at 313). There were signs of crepitus, but not instability. (Id.). There was a full range of motion in the left knee. (Id.). With respect to Plaintiff's back, the physician noted tenderness on the left, but no pain with hip flexion, and normal alignment and range of motion. (Id.). Plaintiff was referred for a second opinion. (R. at 313).

**C. Administrative Hearing**

Plaintiff testified that in the period following her last date of employment, she attempted to further her education by enrolling in an associate's degree program administered via the internet. (R. at 52-53). As had occurred during her period of employment subsequent to her knee and back injuries, Plaintiff's impairments allegedly limited her ability to complete course work. (Id.). Plaintiff claimed that she could only sit in front of the computer for approximately an hour at a time due to her pain. (R. at 53). She then would lay down to alleviate her discomfort. (Id.). Plaintiff claimed that she typically spent three to four hours per day lying down due to pain. (R. at 60).

Plaintiff testified that even in her most recent job as a personal aide to mentally handicapped adults, the rigors of the part-time job produced too much pain. (R. at 56). Plaintiff explained that she was required to do a significant amount of walking. (R. at 56-57). Plaintiff only worked one or two days a week, but it proved to be too arduous. (R. at 57).

Plaintiff complained that her pain was constant, and that injections and pain killers had provided her with limited relief. (R. at 54, 61). Physical therapy was somewhat helpful in allowing her to walk following her surgery. (R. at 58). Plaintiff, however, described requiring a cane to ambulate, including in her home. (R. at 59). Plaintiff expressed a significant degree of trepidation about her doctor's suggestion that she consider another knee surgery, because it had been such a strenuous process recovering from her first surgery. (R. at 58).

Following Plaintiff's testimony, the ALJ asked the vocational expert whether a hypothetical person of Plaintiff's age, educational background, and work experience would be eligible for a significant number of jobs in existence in the national economy if limited to sedentary work not requiring him or her to meet the demands of a rapid production pace. (R. at 62). The vocational expert responded that such a person would be able to work in "ticket sales,"

with 238,000 positions available in the national economy, as a "telephone clerk," with 93,000 positions available, or as a "gate guard," with 106,000 positions available. (Id.).

Plaintiff's attorney asked the vocational expert to state about how much of any given work day an employer expects an employee to be on task. (R. at 63). The vocational expert replied that a worker is expected to be on task for approximately ninety percent of any given work day. (Id.). Plaintiff's attorney then inquired whether a worker would be allowed to lay down while on the job. (Id.). The vocational expert explained that a worker could only lay down during brief, fifteen-minute morning and afternoon breaks, and the typical thirty-minute lunch time. (Id.). Finally, Plaintiff's attorney questioned the vocational expert about typical allowances for absences. (Id.). The vocational expert stated that one absence per month, sometimes two, would be tolerated by an employer. (Id.).

## IV.  STANDARD OF REVIEW

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt.

12

404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[4], 1383(c)(3)[5]; *Schaudeck v. Comm'r Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v.*

---

[4]
> Section 405(g) provides in pertinent part:
>> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action . . . brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business. . . .

42 U.S.C. § 405(g).

[5]
> Section 1383(c)(3) provides in pertinent part:
>> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

*Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor reweigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196-97. "[E]ven where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986).

V. DISCUSSION

The ALJ concluded that Plaintiff had medically determinable severe impairments, i.e., degenerative joint disease of the left knee, chronic low back pain, and major depression. (R. at 11). As a result of her impairments, Plaintiff could only perform sedentary work not requiring dealing with the stress of a rapid production pace. (R. at 13). Based upon the testimony of the vocational expert, the ALJ was able to conclude that Plaintiff was capable of engaging in a significant number of jobs in existence in the national economy despite her limitations. (R. at 16-17). As such, Plaintiff was found ineligible for disability benefits. (R. at 17).

In the present case, Plaintiff's sole contention is that the ALJ erred in failing to find her disabled because he improperly discredited her statements of pain and limitations, despite the

presence of allegedly corroborative objective medical support within the record. (ECF No. 7 at 5-9). The court notes that in cases involving subjective complaints of pain and limitation, an administrative law judge should accord subjective complaints the same treatment as objective medical reports, and weigh the evidence before him or her. *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 122 (3d Cir. 2000). The administrative law judge needs to determine the extent to which a claimant is accurately stating the degree of his or her disability. *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999) (citing 20 C.F.R. § 404.1529(c)). "[I]n all cases in which pain or other symptoms are alleged, the determination or decision rationale must contain a thorough discussion and analysis of the objective medical and the other evidence, including the individual's complaints of pain or other symptoms and the adjudicator's personal observations. The rationale must include a resolution of any inconsistencies in the evidence as a whole and set forth a logical explanation of the individual's ability to work." *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 433 (3d Cir. 1999) (emphasis omitted).

Serious consideration must be given to subjective complaints of pain where a medical condition could reasonably produce such pain. *Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993). Moreover, there need not be objective evidence of a subjective complaint, and the administrative law judge must explain his or her rejection of the subjective complaint. *Id.*; *Burnett*, 220 F.3d at 122. When medical evidence provides objective support for subjective complaints of pain, an administrative law judge can only reject those complaints by providing contrary objective medical evidence. *Mason*, 994 F.2d at 1067-68. While pain itself, however, may be disabling, and subjective complaints of pain may support a disability determination, allegations of pain suffered must be consistent with the objective medical evidence on record. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985); *Burnett*, 220 F.3d at 122.

Plaintiff argues that the ALJ's dismissal of her purported pain and need to lie down during the day was too cursory, and failed to account for the consistent findings throughout the record that Plaintiff experienced severe, debilitating pain. The ALJ limited Plaintiff to sedentary work, but did not otherwise physically accommodate Plaintiff. According to Plaintiff, if the ALJ limited her functional capacity to reflect her credible complaints of pain and limitation, she would be precluded from all work. (ECF No. 7 at 5-9).

With respect to Plaintiff's physical limitations, the ALJ stated:

> The claimant testified that her back and knee pain is so severe that on some days she cannot get out of bed. She also testified that when doing her lessons on the computer she will work about one hour, then she will go to lie down for a rest that may last up to an hour or more.
> …
>
> Although the claimant may find it desirable to lie down for a rest or a nap after one hour of working on lessons at her computer, since she has no fixed schedule and can work at her own pace, there is no evidence that this practice is medically necessary. *No medical source has indicated that such rest periods must be provided.*

(R. at 14) (emphasis added). Additionally, the ALJ remarked that Plaintiff attended only one session with a pain treatment specialist and was not on prescription pain medication at the time of her administrative hearing. (R. at 14). Dr. Wright indicated that Plaintiff could perform sedentary work. (R. at 15).

While the ALJ's discussion of Plaintiff's treatment record for her physical ailments was not exhaustive, Plaintiff fails to provide evidence which contradicts his findings with respect to her limitations. While certain doctors, as reflected in the record, indicated that Plaintiff could not return to her former employment for purposes of worker's compensation benefits, none indicated that she could not perform work as determined by the ALJ. No doctor corroborated Plaintiff's allegations that she needed to rest frequently throughout the day. While physical therapy did not provide Plaintiff with lasting relief, Plaintiff failed to seek help regularly from a

16

pain management specialist. She was taking over-the-counter pain medication at the time of her administrative hearing. Based upon this record evidence – as pointed out by the ALJ – Plaintiff's accounts of her pain and limitations do not appear to be as severe as alleged. As such, the ALJ provided substantial evidence to support his determination that Plaintiff was not entirely credible.

**VI.　CONCLUSION**

Based upon the foregoing, the court finds that substantial evidence supported the ultimate decision by the ALJ to deny disability benefits to Plaintiff. Accordingly, Plaintiff's Motion for Summary Judgment will be denied, Defendant's Motion for Summary Judgment will be granted, and the decision of the ALJ will be affirmed. An appropriate order follows.

By the court,

*s/ Joy Flowers Conti*
Joy Flowers Conti
United States District Judge

Dated: February 23, 2012.